**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

**COBALT BOATS, LLC,**

**Plaintiff,**

v.                                                      **Civil Action No. 2:15cv21**

**BRUNSWICK CORP.,**

**Defendant.**

## OPINION & ORDER

This matter is before the Court on Defendant Brunswick Corporation's ("Brunswick's" or "Defendant's") Motions for Judgment as a Matter of Law and a New Trial, Doc. 356 ("Motions"). For the reasons stated herein, the Court **DENIES** the instant Motions.

### I. BACKGROUND

The Court held an eight (8) day trial in this matter between June 12, 2017 and June 21, 2017. See Docs. 317–337. The jury returned a verdict that Brunswick literally infringed claim 4 of U.S. Patent No. 8,375,880 ("the '880 patent"), infringed claims 4 and 5 of the '880 patent under the doctrine of equivalents, and willfully infringed both of those claims. Doc. 338. The jury calculated the reasonable royalty per unit as $2,500, with an award of $2,690,000. Id. The Court entered judgment on June 23, 2017. Doc. 347.

Brunswick timely filed the instant Motions on July 21, 2017. Doc. 356. Cobalt responded on August 4, 2017. Doc. 384. Brunswick replied on August 10, 2017. Doc. 387. On October 31, 2017, the Court ruled on several post-trial Motions affecting the judgment. Doc. 412. The Court gave Brunswick twenty-one (21) days to make any necessary amendments to the instant Motions in light of the amended judgment. Doc. 414. On November 20, 2017,

Brunswick filed a notice that it intends to rely on its Motions as previously filed. Doc. 416. Both Parties also filed notices of new Federal Circuit opinions regarding patent venue. See Docs. 415, 417.

## II.  LEGAL STANDARDS

### A.  Motion for Judgment as a Matter of Law

Rule 50(b) of the Federal Rules of Civil Procedure allows a party to renew, within twenty-eight (28) days after the entry of judgment, a motion for judgment as a matter of law made pursuant to Rule 50(a) that was not granted by the Court. Fed. R. Civ. P. 50(b). Rule 50(a) explains that such a motion "must specify the judgment sought and the law and facts that entitle the movant to the judgment." Fed. R. Civ. P. 50(a)(2). The Court may grant such a motion if it finds "that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on [the relevant] issue." Fed. R. Civ. P. 50(a)(1). The Court may not, however, "disturb the verdict where there was sufficient evidence for a reasonable jury to find in the non-movant's favor." Dotson v. Pfizer, Inc., 558 F.3d 284, 292 (4th Cir. 2009).[1] In deciding whether to grant a motion for judgment as a matter of law, the Court must view the evidence "in the light most favorable to the prevailing party," id., and may not make credibility determinations, see Price v. City of Charlotte, 93 F.3d 1241, 1249 (4th Cir. 1996).

### B.  Motion for a New Trial

Rule 59(a)(1)(A) of the Federal Rules of Civil Procedure allows the Court, on motion, to grant a new trial "after a jury trial, for any reason for which a new trial has heretofore been

---

[1] The Federal Circuit "review[s] the denial of a motion for judgment as a matter of law or for a new trial under the law of the regional circuit." Verizon Servs. Corp. v. Cox Fibernet Virginia, Inc., 602 F.3d 1325, 1331 (Fed. Cir. 2010) (citing Riverwood Int'l Corp. v. R.A. Jones & Co., 324 F.3d 1346, 1352 (Fed. Cir. 2003). Thus, this Court looks to Fourth Circuit law for the relevant legal standards for the instant Motions.

granted in an action at law in federal court[.]" Fed. R. Civ. P. 59(a)(1)(A). A "decision on a motion for a new trial rests within the sound discretion of the trial court." City of Richmond v. Atlantic Co., 273 F.2d 902, 916 (4th Cir. 1960).

On a motion for a new trial in the Fourth Circuit, it is the duty of the trial court to set aside the verdict and grant a new trial if "(1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors, Inc., 99 F.3d 587, 594 (4th Cir. 1996). The first and second prongs are factual determinations. Fairshter v. American Nat'l Red Cross, 322 F. Supp. 2d 646, 650 (E.D. Va. 2004) (citing Atlas Food Sys. & Servs., Inc., 99 F.3d at 594). "The third prong requires a policy analysis under which the 'judge's unique vantage point and day-to-day experience with such matters lend expertise.'" Id. (quoting same). On a Rule 59 motion, the Court "may make credibility judgments in determining the clear weight of the evidence." Lovell v. BBNT Solutions, LLC, 295 F.Supp.2d 611, 618 (E.D. Va. 2003) (citing Knussman v. Maryland, 272 F.3d 625, 647 (4th Cir. 2001)).

## III.   ANALYSIS

Brunswick's Motions rely on selectively citing portions of the record that are favorable to its view. It cites the disputed opinions of its liability and damages experts as the basis for its Motions on each of the three major issues — the lock, the 180 degree rotation, and damages — and presumes that its experts are more credible than Cobalt's experts in making its arguments. It also cherry picks random statements to support its flawed analysis in the face of substantial testimony to the contrary and other persuasive evidence in the record. Setting aside Brunswick's

biased selective reading of the record and viewing the record as a whole, the Court **DENIES** the Motions as explained in further detail infra.

## A.    Infringement of Claim 4's "Spring Biased Locking Mechanism"

Little of the evidence at trial on this issue varied from the evidence at summary judgment, and thus, much of the Court's rulings at summary judgment still hold true:

> The Delrin washer appears to act as a spring, contrary to Defendants' assertions otherwise, see Doc. 137 at 6, as it flexes in reaction to the movement of the detent on the arm. The detent and Delrin washer test the limits of the patent terms beyond the spring action of the washer, though. Defendants are correct that the Delrin washer does not completely bias movement of the detent, as some measure of force allows the detent to move, but Plaintiff is also correct that it biases movement to some extent, as the mechanism would be completely ineffective in holding the step in a deployed position otherwise. Furthermore, it appears from the Parties' discussion of pins that Defendants' product would more clearly infringe the patent if the pin moved on a spring to escape the washer rather than the washer springing to escape the pin. See Doc. 137 at 6–7; Doc. 128 at 17–19. Thus, the underlying issue appears to be whether a "spring biased locking mechanism" requires a springing pin interacting with the step or whether a springing washer and a static pin can also qualify as such a mechanism.

Doc. 169 at 9. Nothing offered at trial or in this briefing changes the fact that the jury could reasonably conclude that the mechanism at issue was a spring biased locking mechanism.

Brunswick first asserts that both Parties' experts testified at trial that Brunswick's step does not hold a movable arm in a stationary position. Doc. 357 at 4. As Cobalt rightly calls out, Doc. 384 at 3–4, this is just a misinterpretation of the record. Reading just the few pages of cross-examination testimony would tell any reasonable observer that Cobalt's expert Thomas Dyer ("Dyer") believed that Brunswick's hinge does hold a movable arm in a stationary position. Trial Tr. (hereinafter "Tr.") at 481:9–483:4. His explanation was that the hinge holds the movable arm in a stationary position when the step is in water. See id. at 481:17–482:3 (discussing buoyancy). Brunswick appears to be confusing its expert Dr. Charles Garris's ("Garris's") characterization of Dyer's opinion with Dyer's actual testimony at trial. Brunswick

4

clarified on cross-examination that Dyer believed that the hole where the locking occurred in Brunswick's step was where the abutment held the pin. Id. at 476:1–477:13. Garris interpreted Dyer's testimony to be that the locking occurred from the apex of the protrusion to the abutment, which is a range of motion. Id. at 904:15–25. His interpretation is wrong, as Dyer offered no such testimony. For Rule 50 purposes, the Court cannot reweigh the credibility of the witnesses, and the jury could reasonably conclude that Dyer's testimony was credible. For Rule 59 purposes, the Court **FINDS** Dyer's testimony more credible than Garris's because Garris ignored that the step is "for use with a boat in water," as stated in the patent. See '880 patent at 4:15–16, 39–40. He observed that the stud "isn't even touching the Delrin washer," see Tr. at 894:7–8, omitting the key fact that it is not touching when on dry land. His errant characterization of Dyer's testimony further undermines his credibility because it caused him to address a fictional analysis rather than rebut Dyer's opinion. As the Court observed in summary judgment, there is a reasonable question here of whether a Delrin washer that biases movement to some extent but does not completely bias movement of the detent is sufficiently biasing the pin to qualify as holding it in a stationary position. See Doc. 169 at 9. This question of fact was properly a jury question, and Brunswick cannot seek judgment as a matter of law or a new trial by substituting its expert opinion for the opinion of Cobalt's expert.

Brunswick's argument about the spring not biasing anything suffers from similar problems. It relies on two (2) facts: that the Delrin washer's protrusion does not touch the pin, and that the protrusion does not push the pin into the locked position. See Doc. 357 at 5 (citations omitted). The first "fact" assesses the step when on land, not in water, and is clearly errant. The second alleged fact ignores Dyer's opinion that such pushing is not necessary for biasing, as Dyer's theory is that the protrusion biases the pin when it is fully locked in water.

5

The jury reasonably accepted Dyer's interpretation that the protrusion biases the pin in water and that such biasing satisfies the patent, and the jury was not required to accept Brunswick's alternative theory of what is required for biasing. The Court cannot grant judgment as a matter of law or a new trial based upon Brunswick's contested theory that no biasing occurred at all, nor does it find any persuasive reason to prefer Brunswick's definition of biasing over Cobalt's definition.

Finally, Brunswick's argument about whether the hinge had a <u>mechanical</u> lock omits the evidence that is inconvenient to its position. Dyer testified that the detent system used in Brunswick's hinge is a mechanical lock by citing dictionaries defining a detent as a mechanism that locks. Tr. at 446:17–448:22. The argument that tape or gravity can hold elements in place, <u>see</u> Doc. 357 at 5, is irrelevant because no one testified that tape or gravity are mechanisms. Garris opined that he would not use dictionary definitions, but he offered no other recognized definition beyond his own testimony that would contradict the dictionary definition. <u>See</u> Tr. at 915:9–916:14 (referring to sources he would prefer but not actually citing any of them). Brunswick also cherry-picks quotations from the <u>Markman</u> transcript to contest the meaning of a mechanical lock. <u>See</u> <u>id.</u> It appears that Brunswick wants to use selective transcript quotes to recapture its interlock construction in post-trial motions, which the Court will not allow. <u>See</u> Doc. 111 at 36:19–37:8 (rejecting this argument). The argument that one Cobalt inventor, Timothy Kaiser ("Kaiser"), wanted a positive lock, <u>see</u> Doc. 357 at 6, is contrasted in the record by the argument that one Brunswick engineer, Nathan Holmes ("Holmes"), viewed Brunswick's detent as a lock, <u>see</u> Doc. 384 at 6. Viewing the entire record, the Court has no basis for granting judgment as a matter of law or a new trial here.

The Court **FINDS** that this lock issue was still a question of fact. The jury had sufficient evidence to conclude that a springing washer and a static pin qualified as a "spring biased locking mechanism" just as a springing pin and a static washer would clearly qualify as such. No claim vitiation occurs with such a finding because the jury could properly find on the evidence that a detent is a locking mechanism, and such a finding would still prevent options like tape or gravity from meeting the elements of the patent claim. Thus, the Court **DENIES** Brunswick's instant Motions as to literal infringement and infringement under the doctrine of equivalents of Claim 4's spring biased locking mechanism.

**B.      Infringement of Claim 5's "Means for Locking"**

The jury found no literal infringement of Claim 5, see Doc. 338, which means that the issue here is whether they could reasonably find infringement under the doctrine of equivalents. As Brunswick essentially concedes, any argument here relies on the same analysis offered under Claim 4's spring biased locking mechanism. See Doc. 357 at 9 ("This argument fails, however, for the same reasons that the Swim Step lacks the spring biased locking mechanism of claim 4.") If the hinge is a literal spring biased locking mechanism under Claim 4, or even if it is just the equivalent of such a mechanism under Claim 4, it is clearly the equivalent of a "spring biased sliding pin mechanism" for the means for locking under Claim 5. The sliding pin is just one variant of a spring biased locking mechanism, and any other spring biased locking mechanism would inevitably perform substantially the same function in substantially the same way to reach substantially the same result. Thus, because this argument essentially turns on the same analysis as the prior argument, the Court **DENIES** Brunswick's instant Motions as to infringement under the doctrine of equivalents of Claim 5's means for locking.

C.    **Infringement of Claim 4's and Claim 5's Rotation Requirements**

Brunswick reprises its summary judgment argument that the steps must rotate a literal 180 degrees at a minimum. Doc. 357 at 9–12. Claim 4 requires a step that is "capable of being rotated 180° between a stored position... and a deployed position." See Doc. 110 at 17. Claim 5 requires a step that is "configured to permit rotation of said step 180° from a stored position . . . and a deployed position." See id. The Court defined both terms as "No further construction is needed. Plain and ordinary meaning." Id. at 19. The Court added at trial that plain and ordinary meaning "refers to the meaning of a term as viewed from the perspective of a person having ordinary skill in the art." Tr. at 1262:24–1263:2. There was no evidence at trial that any Brunswick step rotates a literal 180 degrees or farther, and thus, the dispute here involves two questions: whether the plain and ordinary meaning is inevitably a literal reading of 180 degrees apart from the rest of the phrase, and whether the Court should have further construed the terms to resolve the dispute.

On the first argument, both sides presented evidence that a person having ordinary skill in the art (POSITA) would read the phrase in their preferred manner. Such evidence was proper, see DNT, LLC v. Sprint Spectrum, LP, No. 3:09cv21, 2010 WL 582164, at *4 (E.D. Va. Feb. 12, 2010), and Brunswick's preference for its expert's opinion over Cobalt's expert's opinion is no basis for granting it judgment as a matter of law or a new trial.

On the second argument, there is a contested waiver issue. Cobalt sought further construction of the term at the jury instruction conference under O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., 521 F.3d 1351, 1361 (Fed. Cir. 2008), but Brunswick is now the Party complaining that the Court did not further construe the term in light of O2 and related precedent. See Doc. 357 at 11–12. The Court **FINDS** that Brunswick did not waive its own O2 argument

because the Court rejected attempts at modifying the definition when Cobalt argued the point, and Brunswick could not have reasonably raised the same type of change that the Court already rejected.

On the merits of the second argument, Brunswick cites a recent Federal Circuit case that applies O2 in a manner it believes would also apply here and require further construction of 180 degrees. See id. (citing NobelBiz, Inc. v. Global Connect, LLC, 16-1104, 2017 WL 3044641, at *2 (Fed. Cir. July 19, 2017)). Even if further construction was necessary under O2 and NobelBiz, any error was not prejudicial to Brunswick because the Court would have ruled in favor of Cobalt's preferred definition. Evidence at trial established that Brunswick's engineers filed a patent application that describes their own step as follows: "rotates 180 degrees from deployed to stowed positions." See Pl.'s Ex. 513 at 53. The record does not contain any evidence of disagreement between the engineers of both Parties prior to litigation as to whether "rotates 180 degrees from deployed to stowed positions" can describe a step that flips in that manner but does not reach a literal 180 degrees. This understanding fits with reading the claim as a whole, which describes a type of movement between a stored position and a deployed position rather than offering a simple measurement of degrees without attached terms. In accordance with the evidence at trial, if this Court were required to make any further changes to the definition of the terms, it would define them as "plain and ordinary meaning, viewed from the perspective of a person having ordinary skill in the art and taking into consideration all of the claim's language." Thus, even if the Court were to agree with Brunswick's O2 objection, Brunswick would be entitled to no relief under the instant Motions.[2]  Further, Brunswick's

---

[2] Jeneric/Pentron does not compel any different result. It is true that numerical figures are construed exactly as written. See Jeneric/Pentron, Inc. v. Dillon Co., Inc., 205 F.3d 1377, 1381 (Fed. Cir. 2000). That doctrine is only a starting point for defining the claim in this case, though, because the number in this claim is only one part of a larger phrase. Brunswick's proposed interpretation of that number alone, apart from the rest of the claim, leads to the odd

argument ignores the evidence that manufacturing and fabrication tolerances render it difficult to impossible to meet exactly 180°.

**D.     Prosecution History Estoppel and Claim 4's and Claim 5's Rotation Requirements[3]**

In analyzing amendment-based prosecution history estoppel, the Court applies the test previously articulated in this case and in this District, which involves four (4) steps. See UCB, Inc. v. Yeda Research & Dev. Co., 117 F. Supp. 3d 755, 775 (E.D. Va. 2015). First, the infringer must establish the existence of a narrowing amendment. Id. Second, the Court must assess the reason for the amendment, such as whether it was made for reasons substantially related to patentability. Id. Third, the Court must assess the scope of the surrendered subject matter, including whether it covers the equivalent at issue. Id. Finally, the patentee may rebut a presumption of total surrender. Id.

Brunswick's argument here is simply a reprise of arguments that this Court has rejected multiple times. See Doc. 169 at 15–18; Doc. 285 at 8–9. Perhaps the most obvious error in Brunswick's argument is that it presumes the accuracy of its definition of the rotation phrase before performing the prosecution history estoppel analysis. It is true that the court presumes that a narrowing amendment made to satisfy any requirement of the Patent Act surrenders all subject matter between the broader and narrower language. Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd., 535 U.S. 722, 736, 740 (2002). Despite that presumption, the

---

conclusion that a step that goes nearly vertical would infringe the patent while a step that flips from exposing one side to exposing the other does not infringe. The absurdity of such a conclusion is likely why no POSITA of either Party ever considered this interpretation before litigation. Every engineer that read that claim knew what it meant, and the creativity of Brunswick's counsel should not defeat the reading that was obvious to virtually every POSITA before litigation started. Claim construction must account for the purpose of the patented invention, see, e.g., Innoval Inc. v. Microsoft Corp., 260 F.3d 1326, 1332–33 (Fed. Cir. 2001), and how a POSITA would understand the claim, see Phillips v. AWH Corp.. 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc). Jeneric/Pentron does not compel a reading of the claim that contradicts other rules of construction, and Brunswick's arguments to the contrary are unpersuasive.

[3] As Cobalt observes, it may be true that the jury did not apply the doctrine of equivalents to the rotation issue. See Doc. 384 at 16. Nevertheless, because Brunswick does not agree with that reading of the verdict, and because the jury did receive a doctrine of equivalents instruction, the Court briefly addresses the issue as an alternative issue, and the Court need not decide whether the jury applied the doctrine of equivalents to the rotations issue.

question of what the narrower language means is antecedent to the question of what was surrendered between the broader and narrower language, and an amendment with a disputed meaning does not automatically assume the Defendant's preferred meaning in a discussion of prosecution history estoppel. Given the reasonably disputed meaning of the amendment in this case, the alleged infringing products cannot be clearly within the scope of surrender. This inevitable finding means that the prosecution history estoppel analysis ends at the third step of this District's Festo analysis. See UCB, Inc., 117 F. Supp. 3d at 775 (stating that the third step is determining the scope of surrender). Manufacturing tolerances only bolster this conclusion by informing the Court of how a POSITA would interpret the narrower language. Thus, the Court need not address either Party's analysis under the fourth step, and the Court **FINDS** that prosecution history estoppel does not bar application of the doctrine of equivalents to this claim element.

E.     **Willful Infringement**

While Brunswick is correct that some evidence indicates that it designed the hinge mechanism to avoid the patent, Cobalt is also correct that the mechanism design is the only change where Brunswick could argue that it sought to design around the patent. "The subjective willfulness of a patent infringer, intentional or knowing, may warrant enhanced damages, without regard to whether his infringement was objectively reckless." See Halo Elecs., Inc. v. Pulse Elecs., Inc., 136 S. Ct. 1923, 1933 (2016). The plaintiff in a patent infringement case only needs to prove subjective willfulness by a preponderance of the evidence. See id. at 1934. It appears from the record that Brunswick examined the Cobalt patent and step and tried to design something as close as possible, but the evidence indicated that it either copied Cobalt's lock idea intentionally or it redesigned its way back to a lock, as both of those interpretations are inferable

11

from the facts in the record and neither is compelled by the evidence. For Rule 50 purposes, the jury ultimately found Cobalt's evidence more credible, and there was sufficient evidence for the jury to reach that conclusion. For Rule 59 purposes, the Court already explained that it agrees with the jury's assessment. See Doc. 412 at 8–10. Thus, the Court **DENIES** judgment as a matter of law or a new trial on this issue.

## F.  Royalty Rate

Brunswick's error throughout the entire royalty dispute is that it applies an overly rigid reading of case law to prevent the Court and the jury from accurately assessing the value of the patent. When properly understood, the case law certainly does not compel Brunswick's view, nor does it favor that position, as explained infra.

### i.  *Smallest Saleable Patent Practicing Unit ("SSPPU")*

Brunswick first argues that the step is the SSPPU by agreement of both Parties' experts. Doc 357 at 22. This is not true. From its first brief on the Motion in Limine regarding Cobalt's expert Kevin Hoffman ("Hoffman"), Cobalt identified one of the key disputes between Hoffman and Brunswick's expert Todd Schoettelkotte ("Schoettelkotte") as whether the SSPPU was the step or the boat with a step. See Doc. 286 at 18 ("Mr. Hoffman properly considers the boat with a Swim Step to be [the] smallest salable patent-practicing unit."). Brunswick cites part of Hoffman's testimony at trial and argues that he conceded the SSSPU argument. See Doc. 357 at 22 (citing agreement that the patent is for the step and agreement that Hoffman analyzed the step on its own as well as analyzing the boat). Brunswick misinterprets his testimony because none of the statements it cites dictate the SSPPU. The only evidence that Hoffman agrees with Schoettelkotte on the SSPPU is Schoettelkotte's assertion of agreement, see Tr. at 1069:22–24, which is completely contradicted by the rest of the record. Neither Hoffman's testimony cited by

Brunswick nor Schoettelkotte's misrepresentation of Hoffman's testimony provides any basis to rule in Brunswick's favor on the instant Motions.

In addition to those record problems, Brunswick's argument also has legal problems because identifying the SSPPU does not necessarily compel any conclusion about the proper damages measurement. Former Federal Circuit Chief Judge Paul Michel co-wrote a paper this year with Former Undersecretary of Commerce / U.S. Patent and Trademark Office Director David Kappos that reviews the relevant case law and offers helpful guidance on this issue. See David J. Kappos and Paul R. Michel, The Smallest Salable Patent-Practicing Unit: Observations on Its Origins, Development, and Future (The Naples Roundtable: 2017 Patent Experts Conference, Jan. 2017), https://www.thenaplesroundtable.org/wp-content/uploads/2017/01/The-Smallest-Salable-Patent-Practicing-Unit-and-Observations-on-Its-Origins-Development-and-Future-by-David-J.-Kappos-and-Paul-R.-Michel.pdf. They observed that the fundamental purpose of the SSPPU concept in the Federal Circuit is to prevent juror confusion in damage awards. Id. at 7–11 & n. 3 (discussing Commonwealth Scientific & Industrial Research Organization v. Cisco Systems, Inc., 809 F.3d 1295 (Fed. Cir. 2015) ("CSIRO"); Ericsson, Inc. v. D-Link Sys., Inc., 773 F.3d 1201 (Fed. Cir. 2014) ("Ericsson"); VirnetX, Inc. v. Cisco Sys., Inc., 767 F.3d 1308 (Fed. Cir. 2014) ("VirnetX"); LaserDynamics, Inc. v. Quanta Computer, Inc., 694 F.3d 51, 56 (Fed. Cir. 2012) ("LaserDynamics"); and Uniloc USA, Inc. v. Microsoft Corp., 632 F.3d 1292, 1320 (Fed. Cir. 2011) ("Uniloc")). It is not a rigid rule, and the Federal Circuit has held that the proper royalty base may be less than or greater than the SSPPU. Id. at 20 (citing VirnetX, 767 F.3d at 326–28 and Ericsson, 773 F.3d at 1225–29, respectively). This flexibility arises because the Federal Circuit's damages law is guided by the Supreme Court's decision in Garretson v. Clark, 111 U.S. 120 (1884), which requires that damages must apportion

"the value contributed by the patented invention to the defendant's product." Id. (citing Garretson). Chief Judge Michel and Undersecretary Kappos explain the flexibility of apportionment as follows:

> Frequently, a patent claims an invention operationalized in a multicomponent device, such as a computer or a smartphone, and the true value of the invention lies in the functionality it enables, not in a disembodied chip that might serve as part of the invention's implementation. To paraphrase the district judge in CSIRO, the value of a book is not measured by the cost of the ink, paper, and binding used to make it.

Id. at 18. This approach mirrors the reality of license negotiations, where the reasonable royalty reflects the value of a patent to a company, not the net profit upon the one component to the exclusion of all other value to the company. See id. at 19–20. That reality is why "[t]he Federal Circuit has repeatedly rejected rigid approaches to patent damages and has emphasized that the trial court has broad discretion to fashion a damages methodology appropriate to the particular case before it," id. at 20–21 (citations omitted), and "the Supreme Court has 'more than once cautioned that courts should not read into the patent laws limitations and conditions which the legislature has not expressed,'" id. at 21 (quoting Bilski v. Kappos, 561 U.S. 594, 602 (2010) (quoting Diamond v. Diehr, 450 U.S. 175, 182 (1981))). As a result, "[i]nflexible rules that interfere with these objectives can only serve to depress innovation incentives and should be avoided." Id. at 22. Thus, although Hoffman disagrees with Schoettelkotte about the SSPPU, the damages analysis in this case would not change even if they agreed.

*ii.    Entire Market Value Rule ("EMVR")*

The flexible approach to damages throughout Federal Circuit precedent applies equally to the EMVR as it does to the SSPPU. See id. at 21 (citing Ericsson, 773 F.3d at 1227). The EMVR as a doctrine consists of two components: a "substantive legal rule" and "a separate evidentiary principle." Ericsson, 773 F.3d at 1226. The substantive rule is essentially the rule of

apportionment discussed above, "that the ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the product, and no more." Id. (citing VirnetX, 767 F.3d at 1326 (citing Garretson, 111 U.S. at 121)). This rule exists because the "reasonable royalty" in 35 U.S.C. § 284 is the "value of what was taken." Id. (quoting Dowagiac Mfg. Co. v. Minn. Moline Plow Co., 235 U.S. 641, 648 (1915)). Cases applying this substantive rule involve parties who failed to perform apportionment, see, e.g., VirnetX, 767 F.3d at 1329, or parties who presented no evidence at all that their patented component drove demand for a multi-component product, see, e.g., LaserDynamics, 694 F.3d at 63; Uniloc, 632 F.3d at 1320 (Fed. Cir. 2011). The evidentiary principle adds to this substantive rule by requiring that courts prevent juries from being misled by unreasonably high values. Ericsson, 773 F.3d at 1227. The purpose, again, is to ensure proper apportionment. See id.

The Federal Circuit likely continues to develop the EMVR because "it is effectively never the case that the patent is responsible for all of the value of a product." Mark A. Lemley, Distinguishing Lost Profits from Reasonable Royalties, 51 Wm. & Mary L. Rev. 655, 663 (2009) (citing Brian J. Love, Note, Patentee Overcompensation and the Entire Market Value Rule, 60 Stan. L. Rev. 263, 278 (2007)). The EMVR began as a doctrine for recapturing lost profits, and it has only entered discussions regarding reasonable royalties because plaintiffs started seeking the effect on sales of a multi-component product as part of the value in royalty assessment. See id. at 664 (noting that the first suggestion that the EMVR applied to reasonable royalty damages occurred in Rite-Hite Corp. v. Kelley Co., 56 F.3d 1538, 1549 (Fed. Cir. 1995) (en banc)). The doctrine appears in negative applications, preventing parties with insufficient evidence from seeking large royalties. See CSIRO, 809 F.3d at 1302. There is no indication that the Federal Circuit ever intended the EMVR to supplant the general rule of apportionment of value. In fact,

it recently stated that apportionment "is 'the governing rule' 'where multi-component products are involved.'" CSIRO, 809 F.3d at 1301 (quoting Ericsson, 773 F.3d at 1226).

Brunswick's argument regarding the EMVR is only cognizable because of the flexibility of this doctrine, and the rigidity that Brunswick seeks undermines its argument. The EMVR, read literally, bans a party from assessing a royalty based on the profits of the entire multi-component product. See, e.g., Uniloc, 632 F.3d at 1318. Hoffman did not perform any such calculation. He assessed damages based on the $5,496 in profits that he found attributable to the patented component, not based on the $20,873 average net profits from the sale of Brunswick's full boats. See Doc. 244-2 ("Hoffman Report") at 21, 26. Thus, if EMVR were a strict rule, it would be beyond dispute that Hoffman does not violate it.

The true issue here is whether Hoffman's allocation of a portion of boat profits to the step before performing his royalty analysis is too close to basing a royalty on full boat profits to be permissible under the EMVR. This issue invokes the evidentiary principle, as Hoffman does not technically violate the substantive rule, but Brunswick contends that he gave the jury an unfairly large number anyway through his technical avoidance of the substantive rule. See Doc. 357 at 25.

Hoffman does not violate the evidentiary principle because the evidence in this case required taking sales into account, and thus, the number that he presented was not unfairly large. If the inability to account for all sales in a royalty base meant that Hoffman could not account for any sales in a royalty base, then no expert could properly apportion the value of the patent in this case in light of Cobalt's evidence.[4] Once the jury found that Cobalt's evidence of the step increasing sales was credible, a royalty that accounted for no increase in sales would not be "adequate to compensate for the infringement," 35 U.S.C. § 284 (2017), while a royalty that

---

[4] The Georgia-Pacific factors account for this flexibility, while Brunswick's reading of the EMVR does not.

accounted for total profits on the sale of each boat would overcompensate Cobalt. Federal Circuit precedent is flexible because it bases apportionment on the facts of a particular case, see CSIRO, 809 F.3d at 1301–02, and does not demand either unjust result. Furthermore, as some commentators have recognized, the reasonable royalty can account for the loss of market exclusivity inflicted by a defendant's infringement. See William F. Lee, A. Douglas Melamed, Breaking the Vicious Cycle of Patent Damages, 101 Cornell L. Rev. 385, 464 (2016). Given Hoffman's apportionment approach, his model does not offer the jury an unfairly high number but instead properly guides them on how to apply the evidence in this case to determine a royalty. The royalty of $3,750 that he calculated would not be unjust on the facts of this case, nor was the royalty of $2,500 that the jury awarded.

Brunswick previously suggested that Cobalt's approach to damages seeks lost profits under the guise of a reasonable royalty. Tr. at 572:23–573:13. This suggestion is rooted in the discussion above, as EMVR was a lost profits doctrine that has extended into reasonable royalty analysis as plaintiffs have started seeking royalties on components in multi-component products. Lemley, 51 Wm. & Mary L. Rev. at 663. That extension likely occurred because a reasonable royalty can account for effects on a multi-component product. See Georgia-Pacific Corp. v. U.S. Plywood Corp., 318 F. Supp. 1116 (S.D.N.Y. 1970) (Factor six (6) references sales of non-patented items, and factor thirteen (13) references profits on non-patented items). There is certainly a risk of overcompensating a plaintiff under reasonable royalty analysis, as the Federal Circuit has acknowledged by extending EMVR to that context. See Lemley, 51 Wm. & Mary L. Rev. at 667 (observing that reasonable royalty analysis overcompensates in many patent cases as part of discussing the extension of EMVR). Nevertheless, any interpretation of reasonable royalty that limited it solely to a single component's profits in a multi-component product would

bifurcate the patent damages statute in cases with evidence of a component affecting sales, demanding a royalty that is <u>not</u> adequate to compensate for infringement. The Sedona Conference's Working Group on this particular issue has cautioned against adopting the interpretation that Brunswick seeks. <u>See</u> The Sedona Conference Working Group on Patent Damages and Remedies (WG9), The Sedona Conference Commentary on Patent Reasonable Royalty Determinations 33 (Dec. 2016). (observing that when determining the value of a patent, it is proper to consider whether the contribution of a patented invention increases the value of the conventional elements of a multi-component product and citing <u>AstraZeneca AB v. Apotex Corp.</u>, 782 F.3d 1324, 1338 (Fed. Cir. 2015)). A reasonable royalty is a floor to adequate compensation, not an exception to it. <u>See</u> 35 U.S.C. § 284 (2017). Furthermore, Cobalt appears to have lost almost $6,000,000 in profits between 2015 and 2016 alone, <u>see</u> Hoffman Report at 53, and it would likely argue for additional lost profits between 2014 and 2015 to enlarge that number. Thus, the $4,035,000 in damages that it sought was lower than what it would have sought under lost profits, and its reasonable royalty analysis is not lost profits by proxy.

Beyond that categorical challenge, the problem with Brunswick's argument about Hoffman's analysis is that Brunswick presumes that the step's only value is the profits on that component alone. <u>See</u> Doc. 357 at 23. Schoettelkotte did testify that the value of the step is only the difference between Brunswick's cost of producing the step and Brunswick's listed price for the step accessory. <u>See, e.g.</u>, Tr. at 1114:21–1115:17, 1132:17–22. This assertion is contrary to the evidence in the record that the value of the step is that it functions as a market differentiator to help sell boats. <u>See, e.g.</u>, Tr. at 292:19–293:9; 338:15–22; <u>see also id.</u> at 552:13–553:4 (observing same at trial).[5] One of the reasons that patent infringement cases go to trial rather

---

[5] The Court has also previously addressed Brunswick's repeated inaccurate assertions in post-trial briefing regarding market share evidence. <u>See</u> Doc. 412 at 22–23.

than reach a settlement amount is because the parties have evidence creating significant differences in the value of the patent. See John M. Golden, "Patent Trolls" and Patent Remedies, 85 Tex. L. Rev. 2111, 2146 (2007). Brunswick's disagreement with Cobalt's valuation is far too extreme, and it is not entitled to a presumption in favor of its own valuation when assessing the credibility of Cobalt's expert. Furthermore, this case is not at all like LaserDynamics, which Brunswick frequently cites under this argument, as LaserDynamics involved "qualitative testimony that an invention is valuable," not actual evidence linking the invention to sales of the multi-component product. CSIRO, 809 F.3d at 1302 (citing LaserDynamics, 694 F.3d at 68). If the jury found the sales evidence in this case credible, as it appears it did, then it also may reasonably recognize that the profits on the step accessory alone do not accurately reflect the value of the patent. Cobalt pursued a royalty, not its lost profits damages, and offered significant evidence linking its component to sales. This factual record justifies some award that recognizes the value of the swim step patent above a single component's profits and below total lost profits, which is exactly what occurred.

None of Brunswick's remaining case law citations change this analysis. Imonex Servs., Inc. v. W.H. Munzprufer Dietmar Trenner GMBH addressed whether a party had met the evidentiary burden for its intentional invocation of the entire market value, see 408 F.3d 1374, 1379 (Fed. Cir. 2005), which is plainly not the situation in the instant case. Network Prot. Scis., LLC v. Fortinet, Inc. is distinguishable because it involved a patented component that was so insignificant that many customers would use the accused products without infringing the patent. See No. 12cv1106, 2013 WL 5402089, at *8 (N.D. Cal. Sept. 26, 2013). Atlas IP, LLC v. Medtronic, Inc. is similarly distinguishable because evidence only showed that the patented

component was qualitatively valuable and did not link it to sales. See No. 13cv23309, 2014 WL 5741870, at *4 (S.D. Fla. Oct. 6, 2014). Thus, none of these cases are on point or persuasive.[6]

### iii.    Accuracy of Hoffman's Analysis

Brunswick offers four (4) objections to Hoffman's analysis. First, it argues that he improperly relied on Cobalt Chief Financial Officer William Wallisch's ("Wallisch's") testimony. Doc. 357 at 28. Second, it contends that selecting 29% as the percentage of sales driven by the step was an arbitrary choice. Id. Third, it insists that Hoffman offered no analysis of how he reached his royalty of $3,750. Id. at 29. Finally, it states that Hoffman's reliance on Cobalt's revenues, profitability, and sales estimates was improper. Id.

The first argument is a rehash of the motion in limine regarding Wallisch's testimony. As the Court stated in a previous Order, "An officer of a company may testify as a lay witness regarding the particularized knowledge he has based on his position as an officer." Doc. 285 at 14 (citing Fed. R. Evid. 701 advisory committee's note to 2000 amendment). Wallisch authenticated the financial reports and data he had as CFO of the company and relayed what that data showed. See Tr. at 335:21–351:8. While he could not offer an opinion as an expert, he could certainly explain his own data as a lay witness under Rule 701. There may be issues with the weight of his testimony, which Brunswick explored thoroughly on cross-examination. See id. at 361:7–377:2. None of those issues present any reason not to admit his testimony. Thus, because Wallisch's testimony was admissible, Hoffman was certainly entitled to rely on it.

The second argument is merely a disagreement with methodology. Disagreements with an expert's conclusions and the legitimate factual assumptions and considerations underlying

---

[6] In addition to the three holdings addressed above, Brunswick also puzzlingly cites to dicta in Lucent Techs., Inc. v. Microsoft Corp., 544 F. Supp. 2d 1080, 1106 (S.D. Cal. 2008). The holding in Lucent Techs. is that the EMVR does not requires that a component be the only basis of consumer demand for a multi-component product. See id. Brunswick presumably wants this Court to find the holding unpersuasive but find the dicta persuasive, as the holding undermines its arguments. The Court declines that invitation.

them affect the weight, not the admissibility, of the expert's testimony. ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc., 694 F.3d 1312, 1333 (Fed. Cir. 2012). Hoffman clearly chose the midpoint of Wallisch's range of 25–33% of sales that the step drove. This is just a proxy argument about whether Wallisch's testimony was admissible, and as explained infra, it was.

The third argument is similarly a disagreement about methodology. Hoffman explained how he arrived at his figure: by establishing a negotiating range for the hypothetical negotiation and then balancing how many factors favored each side in the negotiation to predict an outcome. Tr. at 670:1–672:15. This is a permissible methodology given that the Georgia-Pacific factors are considered as a whole with none predominating. See Unisplay, S.A. v. Am. Elec. Sign Co., 69 F.3d 512, 517 (Fed. Cir. 1995) ("[T]his analysis necessarily involves an element of approximation and uncertainty. . . ."); see also Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d 1301, 1325 (Fed. Cir. 2009) (quoting same). His methodology followed the Georgia-Pacific analysis, making it admissible.

The fourth argument is only about whether Hoffman had market share evidence for Brunswick, as there is no genuine dispute about whether Hoffman used Brunswick's numbers for the rest of his calculation. See, e.g., Tr. at 663:18-664:18 (where Hoffman explains that he examined Brunswick's numbers). On that sole remaining issue, the record understood as a whole supports the inference that Hoffman made regarding Brunswick's step affecting its sales. Cobalt had an increase in market share when it introduced its swim step, and the increase was clearly attributable to the swim step because no other aspect of its business or product changed. Tr. at 708:10–17; cf. id. at 648:6–649:4 (indicating that contemporaneous e-mails from Brunswick employees stated that Cobalt was taking its market share). Its market share then decreased when both (1) nothing changed about its own product and (2) Brunswick introduced

the infringing step. Id. at 654:19–25. Brunswick did attack the assertion that the market was otherwise flat on cross-examination, obtaining the admission that competitors Regal, Four Winns, and Formula experienced increases during the same time. Id. at 678:16–683:6. The chart used for this cross-examination also indicated that Chapparal experienced a decrease during the same time that the other three (3) competitors experienced an increase. See Doc. 244-2 at 51. That decrease covers all but a fraction of a percent of the increase in the other competitors. See id. Cobalt's expert did not examine the other increases and decreases because he regarded the market as cumulatively flat, and the jury was free to believe his flat market theory or to believe Brunswick's theory that its increase was from boat redesigns and that Cobalt's decrease was not causally related. Cobalt even went as far as to find a survey with a customer specifically stating that he bought his boat because of the swim step, see Trial Tr. at 1172:8–10, and a survey where a Cobalt customer who considered purchasing a Sea Ray boat specifically wrote that Brunswick should "[a]dd a flip-down swim platform," Pl.'s Ex. 109.[7] There is sufficient evidence to show that the step affects sales, and given the reasonableness of the inference, selection of the proper percentage for Brunswick's sales is an issue of the weight, not the admissibility, of Hoffman's testimony.

iv.    <em>Hypothetical Negotiation</em>

Brunswick also argues that a hypothetical negotiation would never produce a $2,500 royalty, see Doc. 357 at 23–25, but this entire argument presumes Brunswick's position on the conflicting evidence as to the limited value of the step. No one disputes the fact that the step is a factor but not <u>the only</u> factor in selling a boat, and Brunswick's citations in its briefs only affirm

---

[7] Brunswick's expert also added his own observations regarding further survey evidence and the weight of Cobalt's evidence. See Trial Tr. at 1080:3–1082:4. Of the surveys that mentioned the swim step, about half were positive, and half were negative, see id. at 1105:1–4, although people taking the time to fill out a survey and specifically discuss the swim step was incredibly rare because it did not ask about the swim step, see id. at 1163:12–1165:4.

22

that basic fact. See id. at 24. In light of that fact, a portion of the value of the patent is how much it helps sell boats, and any hypothetical negotiation would have to assess that number to determine a reasonable royalty. Contrary to Brunswick's assertion, Georgia-Pacific factor 15 does not command any different outcome here. There is no evidence that Brunswick would fail to make a profit from adding the step at that royalty price, nor does factor 15 compel the assessment of profits on just the one component to the exclusion of its total effect on profits. The hypothetical negotiation must be a fair one, and no reasonable Cobalt negotiator would accept a royalty rate that does not account for the effect on sales. Thus, the Court **FINDS** that a hypothetical negotiation could reasonably reach a royalty of $2,500, or indeed, the $3,750 posed by Hoffman.

### v.    Conclusion

Hoffman does not agree with Brunswick regarding the SSPPU and does not violate the EMVR, nor is his analysis otherwise inadmissible, and a hypothetical negotiation could properly reach both the jury's final royalty as well as the amount he recommended for a royalty. The SSPPU also does not necessarily compel any conclusion about the proper damages measurement and does not alter that conclusion about Hoffman's opinion. At best, Brunswick raises issues of weight, not admissibility, and its expert's testimony that failed to account for the sales evidence in the record is not entitled to any presumption of correctness in evaluating Hoffman's testimony, nor was the jury unreasonable in finding Hoffman's testimony more credible than Schoettelkotte's testimony. Thus, the Court **DENIES** Brunswick's request to remit the royalty or order a new trial on damages.

## G. Venue

In its original briefing, Brunswick offers nothing but a brief conclusory argument objecting to the venue in light of <u>TC Heartland LLC v. Kraft Foods Grp. Brands LLC</u>, 137 S. Ct. 1514 (2017), and objecting to the Court's ruling that it waived venue. <u>See</u> Doc. 357 at 30. Since the original briefs, the Parties both pointed to new case law from the Federal Circuit indicating that a district court abuses its discretion when it either grants or denies a motion to transfer in light of <u>TC Heartland</u> based on Rule 12 alone. <u>See</u> Docs. 415, 417 (attaching <u>In re Micron Tech., Inc.</u>, 2017-138, 2017 WL 5474215 (Fed. Cir. Nov. 15, 2017) and <u>In re Cutsforth, Inc.</u>, No. 2017-135 (Fed. Cir. Nov. 15, 2017), respectively). The Federal Circuit observed that it found no clear abuse of discretion in denying a transfer in this case, where the motion was first raised "two [2] weeks before trial." <u>See</u> <u>In re Micron Tech., Inc.</u>, 2017 WL 5474215, at *8 & n. 4.

The Court **FINDS** that Brunswick has forfeited its right to seek new venue for two reasons: (1) because the motion right before trial was untimely, and (2) because that motion was part of a pattern of delay tactics by Brunswick. As the Federal Circuit observed, district courts have the authority to consider the timeliness and adequacy of a venue objection pursuant to 28 U.S.C. § 1406(b). <u>See</u> <u>id.</u> at *7. Granting the untimely motion in light of Brunswick's delay tactics would have effected a postponement of an imminent trial date and would be contrary to the "just, speedy, and inexpensive determination" that this court must seek. Fed. R. Civ. P. 1

Brunswick did not contest the propriety of venue throughout over two (2) years of litigation. In its Answer on March 12, 2015, Brunswick stated that it "does not contest [that] venue is proper within this judicial district, but [it] denies that this district is the most convenient forum for Cobalt's action." Doc. 15 at 4. That same day, it filed a Motion to Transfer Venue Pursuant to 28 U.S.C. § 1404(A) ("Motion to Transfer"). Doc. 17. The Court DENIED the

Motion to Transfer on April 16, 2015. Doc. 33. Brunswick never contested the propriety of venue at all, as a Motion to Transfer under § 1404 is only permissible when venue is proper. See Symbology Innovations, LLC v. Lego Sys., Inc., --- F.3d ----, No. 2:17cv86, 2017 WL 4324841, at *4 (E.D. Va. Sept. 28, 2017). Brunswick also never sought a new venue after that date until the new Motion to Transfer filed on May 30, 2017. Doc. 280. That new Motion to Transfer occurred after discovery closed and after summary judgment briefing and decisions were completed, and it was first mentioned at the Final Pretrial Conference when trial was imminent. The Court **FINDS** that the new objection to venue was not timely and that Brunswick had failed to adequately contest venue to preserve that objection after the case had reached the point of no reasonable return.

Brunswick also has a pattern of delay tactics in this case. After the § 1404 Motion previously noted, Brunswick filed a Motion to Stay the case pending Inter Partes Review ("IPR") on April 27, 2015, before the U.S. Patent and Trademark Office (USPTO) even instituted IPR. See Docs. 34, 39. The Court DENIED that Motion because it was premature. See Doc. 39. On October 19, 2015, Brunswick renewed the Motion to Stay because the USPTO instituted IPR. Doc. 50. The Court GRANTED that one (1) year stay on November 16, 2015. Doc. 63. Although Brunswick only requested a stay for the IPR in its original motion, it filed another Motion to Stay pending further appeals of the IPR decision on October 20, 2016. Doc. 78. Then, it filed the new Motion to Transfer on May 30, 2017. Doc. 280. Brunswick's eagerness to delay the case is apparent from its five (5) different attempts move or stay the case for various reasons. This pattern would have unfairly prejudiced Cobalt if the Court allowed Brunswick to continue its infringement by granting the fifth, and very belated, venue objection when the case was ready for trial. The Court also would have violated the intent of Fed. R. Civ. P. 1 by

permitting such a delay. Thus, pursuant to the Court's inherent power, 28 U.S.C. § 1406(b), and Fed. R. Civ. P. 1, the Court **FINDS** that forfeiture applies on these facts and **DENIES** the instant Motion for a New Trial based on venue.

## IV.    CONCLUSION

Brunswick's Motions are based upon ignoring evidence unfavorable to it and presuming the credibility of its experts over Cobalt's experts. Brunswick's citations to the record do not accurately reflect the whole record of trial. After reviewing all of the evidence, and for the reasons stated herein, the Court **DENIES** the instant Motions, Doc. 356.

The Clerk is **REQUESTED** to send a copy of this Opinion & Order to all counsel of record.

It is so **ORDERED**.

/s/

Henry Coke Morgan, Jr.
Senior United States District Judge

HENRY COKE MORGAN, JR.
SENIOR UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
November _4_, 2017
December